# IN THE UNITED STATES DISTRICT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | **Case No. 17 CR 518** |
| v. | ) | |
| | ) | **Judge Kennelly** |
| | ) | |
| HEATHER MACK | ) | |
| | ) | |
| | ) | |

## <u>DEFENDANT HEATHER MACK'S SENTENCING MEMORANDUM</u>

Defendant, Heather Mack, by and through her undersigned counsel, respectfully submits the following Sentencing Memorandum:

## I.    <u>OBJECTIONS TO THE PSR</u>

Ms. Mack objects to the PSR at page 13, paragraph 44. Specifically, Ms. Mack objects to the statement contained near the bottom of that page which states: "For instance, she was reportedly officially or unofficially granted weekend furloughs outside of the facility and had her own cellular telephone." Ms. Mack asserts that this statement is false, in part, because she never received any such furloughs whatsoever. In addition, Ms. Mack, like many of her follow detainees at the Kerobokan Prison in Indonesia, had the use of a cell phone during certain time periods – however, cell phones were against the rules of that institution. *See* further discussion of cell phone usage below.

Ms. Mack objects to the PSR at page 14 (first full paragraph), paragraph 44. Here, Ms. Mack objects to Agent Richardson's overall assessment of the nature of her experience as a detainee of the Kerobokan Prison—which grossly misstates the nature of her time there—as well as the veracity of certain specific statements contained therein. First, Ms. Mack asserts that she

never "yelled at the warden." Furthermore, Ms. Mack maintains that, while her case received heightened attention, this never resulted in preferential treatment, or a privileged "celebrity" status. *See* further discussion of the alleged "celebrity" and related issues below. Quite the contrary is true, as detailed further below. In short, Agent Richardson has absolutely no legitimate basis for his unfounded assertions. Indeed, one need only "Google" the Kerobokan Prison to begin to get a slight picture of the horrendous conditions at that institution. They are also detailed further below. Moreover, Agent Richardson, unlike Ms. Mack, has never spent a day in the custody of that institution.

Ms. Mack objects to the PSR at page 14 (second full paragraph), paragraph 44. The inference drawn from the statements Ms. Mack made during a media interview in 2019 are patently false. As described further below, Ms. Mack was forced to make such statements by Kerobokan Prison officials, including the Warden. Ms. Mack did not bribe prison officials for special treatment, early release, or any other reason – nor did she receive special treatment or early release because of monies paid or favoritism considerations.

Ms. Mack objects to the PSR at page 16, paragraph 54. Ms. Mack made all efforts to return the referenced forms to US Probation.

Ms. Mack proposes a correction to the PSR at page 17, paragraph 57. Ms. Mack respectfully notes that she presently has some contact with her deceased father's grandchildren, not Deborah Mack's, as currently indicated.

## II.     PROCEDURAL BACKGROUND

On June 16, 2023, Ms. Mack pled guilty to Count 2 of the Indictment pursuant to a written Plea Agreement ("Agreement"). Count 2 charged her with conspiracy to kill a United States national, in violation of 18 U.S.C. §1117. *See* Dkt, at No. 108. In short, the Agreement provides, *inter alia*, for a sentence not greater than 28 years, with each party allowed to argue for

the imposition of an appropriate sentence; provided, however, that this Court first accepts the parties' Agreement.

## III.   <u>PERSONAL BACKGROUND</u>

### *Ms. Mack's Young Life*

Ms. Mack is 28 years old. She was born, raised, and lived most of her life in the Chicago area, primarily in Oak Park. She was the only child of James Mack, an African-American male, and Sheila Von Weise, a Caucasian female. Ms. Von Weise married later in life, and Mr. Mack was significantly older than her. Ms. Mack enjoyed a wonderfully close relationship with her father until his death in 2006, from a pulmonary embolism while the family was on vacation overseas (discussed below).

During her early childhood, Ms. Mack enjoyed a positive relationship with both of her parents. Ms. Von Weise, who had not been blessed with many material possessions as a child, went out of her way to dote on Ms. Mack. Ms. Mack also recalls enjoying many typical childhood activities—playing with dolls, visiting the park, swimming, and ice skating. Ballet was also a great passion of hers. Starting at age two, Ms. Mack diligently practiced for two-hours, three times each week, until she was about seventeen. She was also a Girl Scout and dabbled in acting classes at *Second City*.

Ms. Mack also recalls going out with her parents with some regularity – at least until her father became wheelchair bound. They would see movies at the theater, attend charity events, listen to the symphony, and enjoy opera performances.

When it came to the holidays, Ms. Mack would spend time with her mother's side of the family. Although Ms. Mack has six elder paternal half-siblings, Ms. Von Weise would generally not allow Ms. Mack to have contact with her father's side of the family.

### *Ms. Mack Suffered Extensive And Ongoing Trauma During Her Childhood*

As thoroughly detailed in the PSR and by Dr. Pesanti, Ms. Mack suffered frequent and continuous exposure to domestic abuse and violence. She was also the victim of such abuse and violence at the hands of her mother, as well as her co-Defendant, Tommy Schaefer. *See* PSR, ¶¶ 59-64; *see also* Dr. Pesanti's Report.

Both the Guidelines and the §3553 factors permit this Court to consider the weight of such factors in terms of fashioning Ms. Mack's sentence.

### *Early Exposure To Domestic Abuse And Violence*

Ms. Mack had an indisputably close relationship with her father, whom she describes as her "caregiver and best friend." *See* PSR, ¶55. She recalls many good memories from her childhood, particularly related to her father. Her father retired when she was two and became her primary caregiver. The family of three lived in what Ms. Mack describes as a big house in a nice area, and she was provided with many material possessions as a result of her father's financial success. Sadly, however, a much darker part of her childhood is equally as memorable.

Despite her fond memories of, and good relationship with, her father, Ms. Mack also witnessed him as the aggressor during instances of domestic violence from as far back as she can recall. This included both regular verbal arguments, and physical altercations. For example, Ms. Mack witnessed her father slap her mother, push her down the stairs, and bully her in various ways. She describes her father as having been a large and powerful man, as well as the financial provider in the home – up until the time that he suffered a devastating injury and became wheelchair bound. Consequently, Ms. Mack's mother did not fight back. This troubling dynamic changed, however, after her father suffered that debilitating accident.

While the family was aboard a cruise ship during a family vacation to Greece, Ms. Mack (who was five years old at the time) witnessed her father cut his heel badly. Unfortunately, that

injury caused sepsis, and resulted in James Mack being in a three-week coma. Moreover, ultimately, James Mack was left paralyzed from the waist down. Rather than diminishing the domestic violence in the home, the dynamic just essentially reversed itself.

Although Ms. Von Weise was not physically violent towards James Mack - as he had been to her - she would taunt and abuse him in other ways. For instance, Ms. Mack recalls that her mother would often place her father's wheelchair out of his reach, leaving him unnecessarily bedridden and confined to his room and to other spaces. Her mother was also frequently intoxicated and would neglect her father's needs. That increased after he was diagnosed with colon cancer. Although only a very young child at the time, Ms. Mack increasingly acted as her father's caregiver to make up for her mother's neglect of her father. Ms. Mack also became increasingly verbal about her mother's treatment of her father, which resulted in verbal arguments between Ms. Mack and Ms. Von Weise.

Another tragedy struck James Mack, Ms. Von Weise, and Ms. Mack, a few years after he became wheelchair bound. While on vacation in Greece, James Mack died. He died right in front of young Heather Mack. This was entirely unexpected. Understandably devastated, Ms. Mack, who was ten years old at the time, told her mother that she wanted to return home rather than finish the planned vacation. Ms. Von Weise, however, decided to continue the trip. Ultimately, James Mack's death seemed to substantially aggravate the already strained relationship between Ms. Mack and Ms. Von Weise.

### Domestic Abuse And Violence Continued After James Mack's Death

Prior to James Mack's death, Ms. Mack had already suffered from abuse and neglect. Ms. Mack recalls her mother occasionally declaring that she had taken an overdose of pills, and locking herself in her bedroom - sometimes for several days at a time. As a very young child, and

fearing for her mother's safety, Ms. Mack naturally turned to James Mack who would stay with her while she slept outside her mother's room.

Ms. Von Weise was sometimes physically violent towards Ms. Mack. Some of her earliest memories of her mother involve such episodes. Ms. Von Weise would sometimes slap, hit, and shake her violently. At that time, Ms. Mack was too small to, and did not, fight back. As Ms. Mack grew older, this dynamic clearly changed. However, some of their arguments resulted from Ms. Mack's attempts to protect Ms. Von Weise from herself. On various occasions, Ms. Mack hid her mother's alcohol and vehicle keys to prevent her from driving drunk. In response, Ms. Von Weise would lash out at Ms. Mack. Sometimes local law enforcement would intervene, and would typically acknowledge and accept Ms. Von Weise's narrative. Ms. Mack admits that, even on the occasions where she believed that she had been the initial victim of the physical or verbal encounter between the two, she did not tell the Police the full account of the occurrences.

Furthermore, Ms. Von Weise, who was Caucasian, with blonde hair and blue eyes, would frequently denigrate Ms. Mack for looking more like her father, a black man. From as early on as kindergarten, Ms. Mack recalls feeling ashamed for not more resembling her mother. Indeed, Ms. Von Weise once pointed to one of Ms. Mack's first grade classmates—who physically resembled Ms. Mack's mother—and said she wanted a child who looked more like her. Consequently, Ms. Mack often felt her looks were disappointing to her mother, and generally not good enough. When Ms. Von Weise was intoxicated, she would sometimes call Ms. Mack by her father's name because of how much she resembled him. Ms. Von Weise would also call Ms. Mack other names, including the "N-word."

Ms. Mack recalls having frequent bathroom "accidents" as a child, for which she was often bullied by her elementary school peers. Ms. Von Weise caused Ms. Mack to believe that

such "accidents" resulted from a medical condition that required surgery. Because of this, Ms. Von Weise made Ms. Mack wear diapers until she was at least ten years old. Eventually, Ms. Mack realized that she did not have a medical condition and simply stopped wearing diapers, which seemed to anger her mother.[1]

### *Ms. Mack Suffered Abuse And Violence From Tommy Schaefer*

Ms. Mack met her co-Defendant, Tommy Schaefer, in high school. They began dating and were eventually engaged. Ms. Von Weise made no secret of the fact that she hated Mr. Schaefer, and that feeling was mutual between those parties. Ms. Mack suffered from abuse and violence during her relationship with Mr. Schaefer. Perhaps because of her own home life experiences, Ms. Mack did not view that type of conduct as particularly unusual. Moreover, because of the nature of her relationship with Ms. Von Weise and because of Ms. Von Weise's feeling about Mr. Schaefer, Ms. Mack never told her mother of Ms. Schaefer's conduct.

Mr. Schaefer's pattern of abuse towards Ms. Mack continued, even after their convictions and imprisonment in Indonesia. At the Kerobokan Prison, male detainees initially had nearly unfettered access to their female counterparts. Receiving no deterrence from the prison staff, apparently largely due to the submissive role that Indonesian women were expected to play, Ms. Schaefer on occasions would punch, choke, slap, or push Ms. Mack around. Some of those occurrences of violence occurred even at times when Ms. Mack was holding her infant daughter. Eventually, the Kerobokan Prison erected a wall, effectively segregating the male and female

---

[1] Defendant's expert witness, Dr. Pesanti, interviewed the Counselor, Ms. Conforti, who served the role of jointly providing counseling to Ms. Von Weise and Ms. Mack, in and about Ms. Mack's high school years. She fully corroborated the unhealthy, toxic, and mutually abusive relationship between Ms. Von Weise and Ms. Mack.

populations. After that, Ms. Mack's in-person negative (and positive) encounters with Mr. Schaefer all but stopped.[2]

To be clear, however, Ms. Mack does *not* in any way contend that *all* of her in-persons encounters with Mr. Schaefer at the Kerobokan Prison were unwanted, non-consensual, unfriendly, or resulted in abuse or violence.

Mr. Schaefer was also verbally and emotionally manipulative toward Ms. Mack. She was susceptible to this type of behavior because, at the Kerobokan Prison, she initially knew no one other than Mr. Schaefer. Ms. Mack felt exceedingly alone, and vulnerable to a fault. It was only after her in-person interactions with Mr. Schaefer ended that Ms. Mack began to recognize the patterns of abusive behavior that she had witnessed, and was the victim of, throughout her life. She also began, slowly, to understand how those experiences shaped her own choices and conduct – and her own misconduct.

All of that said, Ms. Mack **fully** appreciates her culpability. She likewise **fully** and **genuinely** accepts complete responsibility for the actions that resulted in her being charged criminally, both in Indonesia and before this Court. Her desire to better analyze the nature of the abuse and violence she suffered, and to grow and learn from it, is *not* some attempt to fashion an escape from culpability; but rather to better recognize, and avoid contributing to those same types of patterns with her own daughter, Stella, and in all of her other future relationships. That process will of course likely be a life-long endeavor.

Moreover, there is no question Ms. Mack was deeply troubled during her high school years. *See* also Dr. Pesanti's Report. She takes responsibility for **all** of her conduct during that

---

[2] Ms. Mack was even cajoled into making a false video regarding Ms. Schaefer's involvement in the murder of Ms. Von Weise, in which she is seen claiming that he had nothing to do with the whole thing.

time period, including the physically and abusive conduct that she directed at her mother and all of her other misconduct. Ms. Mack painfully regrets the way that she treated her own mother, and of course regrets and is extraordinarily remorseful for her own pivotal role in Ms. Von Weise's murder. Ms. Mack will also make this clear during her allocation at the sentencing hearing.

## IV.    DEFENDANT'S POSITION REGARDING SENTENCING

***The Avoidance of Unwarranted Sentencing Disparities Justifies And Supports The Imposition Of A 15-Year Sentence, Minus The Time That Ms. Mack Already Served In The Kerobokan Prison[3]***

One of the seminal 3553 factors is the avoidance of "unwarranted sentencing disparities." *See, e.g., United State v. Peters*, No. 22 C 50389, 2023 WL 4665119 (N.D. Ill., July 20, 2023) (*quoting United States v. Oliver*, 873 F.3d 601, 608 (7th Cir. 2017)) ("When imposing a sentence, district judges must consider 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.'"). Section 3553 does not ban "all disparities; its concern is only with *unwarranted* disparities." *Id.* (emphasis in original). However, Section 3553 "provides for discretionary comparison and applies to defendants with similar records who have been found guilty of similar conduct." *United States v. Sanchez*, 989 F.3d 523, 539 (7th Cir. 2021) (*quoting United States v. Durham*, 645 F.3d 883, 897 (7th Cir. 2011)). Thus, the Seventh Circuit has made clear that it remains "open in all cases to an

---

[3] As noted in her prayer for relief (WHERFORE clause), Ms. Mack seeks a total sentence of *8 more years* – calculated by her and her counsel's position that a 15-year sentence, but one that then fully takes into account her 7 years served at Kerkoban Prison – is the most appropriate one under all of the circumstances presented. Such an additional 8-year sentence is one that would *not* be greater than necessary to achieve all of the legitimate aims of sentencing, under section 3553 and otherwise.

argument that a defendant's sentence is unreasonable because of a disparity with the sentence of a co-defendant." *Sanchez*, *supra*, 989 F.3d at 541.

Here, as set forth below, sentencing Ms. Mack to a term of incarceration of more than 15 years, and to a term of incarceration that does *not* also include and credit her (minus) for the time she served in the Kerobokan Prison, would clearly create an unwarranted sentencing disparity in light of the sentencing that has already taken place in this District of one of Ms. Mack's co-conspirators, Robert Bibbs ("Bibbs"). *See United States v. Robert Ryan Justin Bibbs*, No. 15 CR 00578 (N.D. Ill.).

Bibbs is the cousin and close friend of Ms. Mack's co-Defendant in the present case, Mr. Schaefer. *Id.* at Dkt. No. 23, at p. 1, paragraph 1(d). Bibbs was charged by Indictment with the very same offenses as Ms. Mack. *Id.* at Dkt. No. 23. In sum, the Government alleged that Bibbs, Ms. Mack, and Mr. Schaefer worked in tandem to conspire to kill Ms. Von Weise by engaging in actions in the United States and in Indonesia. *Id.* at Dkt. No 23. More specifically, the Indictment against Bibbs alleged that he: 1) provided advice, encouragement, and direction to Ms. Mack, prior to her going to Indonesia, about how to kill Ms. Von Weise; 2) provided advice, encouragement, and direction to Mr. Schaefer on the day prior to Ms. Von Wiese's murder, while Mr. Schaefer was in Indonesia, about how to kill Ms. Von Weise; 3) provided advice, encouragement, and direction to Mr. Schaefer on the day of Ms. Von Wiese's murder, while Mr. Schaefer was in Indonesia, about how to kill Ms. Von Wiese. *Id.* at Dkt. No. 15, at pp. 2-3, at paragraph 4. In addition, immediately after Ms. Von Wiese's murder, Bibbs and Mr. Schaefer communicated about the murder and Ms. Von Wiese. *See* Bibbs' June 2, 2017 sentencing transcript, submitted herewith as an Exhibit, at pp. 60-61.

Furthermore, Mr. Bibbs admitted in his written Plea Agreement that he played a crucial and instrumental role in the offenses underlying the murder of Ms. Von Wiese. *See* Bibbs' Plea Agreement, submitted herewith as an Exhibit, at pp. 2-6, paragraph 6. That role included, *inter alia*, conversations with Ms. Mack regarding Ms. Von Weise's murder; discussions with Mr. Schaefer regarding Ms. Von Weise's murder; texts with Mr. Schaefer regarding Ms. Von Weise's murder, including advice with respect to how Mr. Schaefer should kill Ms. Von Weise – and how to do so, if there were, or were not, cameras present; communications with Mr. Schaefer while he was in Indonesia, intending to encourage Mr. Schaefer to kill Ms. Von Weise; communications with Mr. Schaefer while he was in Indonesia, which were designed to "reduce the likelihood of [Mr. Schaefer and Ms. Mack] being caught and prosecuted if they followed his advice; and Bibbs' being involved in the plot to kill Ms. Von Weise so that he could "share some of the proceeds" arising out of Ms. Von Weise's murder with Mr. Schaefer and Ms. Mack. *Id.* (brackets added).

Finally, the Government repeatedly emphasized to the Court (Judge Pallmeyer), at Bibbs' sentencing hearing, that Bibbs in fact played a quite crucial role in the murder of Ms. Von Weise, including as follows:

> The Defendant's role in the offenses was **significant**. In his filing, **he [Bibbs] says the Government overstates his involvement, but that's not accurate** . . . **there was no specific plan and no specific action until after the defendant [Bibbs] was involved.**

> . . . He [Bibbs] was **deeply involved** in the conversations in which they discussed this specific murder . . . he was **absolutely involved** in hatching this specific plot . . . the plot to do so in Indonesia . . .

> Because he [Bibbs] wanted to be rich.

> **He was their** [Schaefer's and Ms. Mack's] **coach . . . he was telling them how to do it. He also gave them the 'rah rah' locker room speech. 'It's go time.' He was firing up his cousin** [Schaefer] to go commit a murder.

**That is what the Court is sentencing the defendant** [Bibbs] **for, not for just standing on the sideline.**

*See* Bibbs' sentencing transcript hearing, *supra*, at pp. 62-64 (emphasis and brackets added).

Moreover, prior to his sentencing hearing, Bibbs repeatedly violated the terms of his pre-trial release; beat up a witness to his case; and was involved in another (i.e., wholly unrelated to Ms. Mack and Mr. Schaefer) plot to rob and harm someone during the same time period he was involved with Mr. Schaefer and Ms. Mack with respect to Ms. Von Weise's death. *Id.* at pp. pp. 24-28; 32-34; 65.

Bibbs was facing a maximum term of imprisonment of life,[4] with a sentencing Guidelines range of 210 to 262 months. *Id.* at p. 78. Judge Pallmeyer ultimately sentenced Bibbs to a term of incarceration within the BOP of 9 years (108 months). *Id.* at p. 78.

Based upon all of the foregoing, including Bibbs' crucial role in the murder of Ms. Von Weise, the spirit and purpose of section 3553's explicit admonition to avoid "unwarranted" sentencing disparities would be substantially undermined by the imposition of a sentence *any greater than* 15 years and which does *not* include and account for the time (as a reduction) that Ms. Mack has already served in Indonesia. In fact, even if this Court concludes that Ms. Mack had a more central role in the offense than Bibbs, Ms. Mack has *already* served more time (combining her Kerobokan Prison and Chicago MCC time to-date) than Bibbs will ever serve – by at least a couple of years. Thus, the imposition of a sentence by this Court upon Ms. Mack of 15 years, minus full credit for the time that Ms. Mack has already served at the Kerobokan Prison, would be more than sufficient and "not greater than necessary" to satisfy any and all of

---

[4] Pursuant to the terms of Bibb's Plea Agreement, however, his maximum sentence was capped by agreement at 20 years. See Bibbs Dkt. at No. 77, at p. 10, paragraph 11. Here, Ms. Mack's maximum term is capped at 28 years.

the legitimate aims of sentencing. More importantly, it would serve to avoid unwarranted sentencing disparities between the sentence assessed to Bibbs and Ms. Mack's sentence. It would be essentially a sentence that is *double* than what Bibbs will serve. That makes further sense in light of the fact that, as noted above, the Government was comfortable in agreeing to a maximum sentence of 20 years for Bibbs, per his Plea Agreement, and was comfortable in agreeing to a maximum sentence of 28 years for Ms. Mack, per the terms of her Plea Agreement.

### *A 15-Year Sentence, Minus The Time Ms. Mack Has Already Served In The Kerobokan Prison, Is Consistent With The Trend Of The Courts Nationally In Recognizing That Young Offenders, Like Ms. Mack, Are <u>Less</u> Culpable Based Upon The Compelling Scientific Research Regarding Adolescent Brain Development*

Ms. Mack was 18 years old at the time of the offense conduct. Recently, courts, including the United States Supreme Court, have explicitly recognized that youthful offenders like Ms. Mack can, and often must, be treated as *less* culpable - including for purposes of sentencing – based upon the scientific research regarding adolescent brain development. *See, e.g., Graham v. Florida*, 560 U.S. 48 (2010).[5]

One such recent decision, *United States v. Ramsay*, 538 F.Supp.3d 407 (S.D.N.Y. 2021), provides an excellent summary and "state of the law" with respect to the application of these concepts. As the court in *Ramsay* first noted, **"Youth Matters in Sentencing."** *Id.* (emphasis in original). The *Ramsay* court went to explain that, "[i]n several cases since the 1980s, the Supreme Court has held, based on "the evolving standards of decency that mark the progress of a maturing Society . . . that 'youth matters in sentencing.'" *Id.* at 415 (*citing Roper v. Simmons*,

---

[5] In *Graham*, the United States Supreme Court noted that "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds. For example, parts of the brain involved in behavior control continue to mature through late adolescence." *See Graham,* 560 U.S. at 568 (*citing* Brief for American Medical Association et al. 16–24; Brief for American Psychological Association et al. 22–27).

543 U.S. 551, 561 (2005), *Trop v. Dulles*, 356 U.S. 86, 100-101 (1958), and *Jones v. Mississippi*, 141 S.Ct. 1307, 1315 (2021).

The *Ramsay* court first noted that, in *Thompson v. Oklahoma*, 487 U.S. 815 (1988), the Supreme Court, among other things, "engaged in its own analysis of the differences between adolescent and adults and concluded that 'less culpability should attach to a crime committed by a juvenile than to a comparable crime committed by an adult.'" *Ramsay*, 538 F.Supp.3d at 415 (*quoting Thompson,* 487 U.S. at 835).

The *Ramsay* court then explained that, in *Roper v. Simmons*, 543 U.S. 551 (2005), the Supreme Court subsequently "adopted and expanded the view" regarding the difference between youthful and adult defendants by relying "largely on everyday experience to inform its judgments regarding the adolescent brain." *Id.* The *Ramsay* court further noted that, in *Roper* - in the context of examining the death penalty as applied to youthful offenders - the Supreme Court "again relied on everyday experience, **but it also cited recent developments in the psychological and sociological literature that helped explain adolescent impulsivity and the like.**" *Id.* (emphasis added).

The *Ramsay* court further explained that, in *Graham v. Florida*, 560 U.S. 48 (2010), the Supreme Court - in the context of considering life sentences for youthful offenders without the possibility of parole - relied on "developments in psychology and brain science [that] continue to show fundamental differences between juvenile and adult minds. For example, parts of the brain involved in behavior control continue to mature through late adolescence." *Id.* (*citing Graham*, 560 U.S. at 68).

Furthermore, the *Ramsay* court, in reviewing the appropriateness of the sentence imposed in the case before it (which was committed by an offender who was 18 years old at the

time), stated that, "this Court, like the Supreme Court, looks not only to the general impressions

provided by everyday experience ("common sense") **but also to the more refined and tested**

**evidence concerning development of the adolescent brain** provided by recent **research and**

**studies in neuroscience, psychology, and sociology.**" *Ramsay*, 538 F.Supp.3d at 417. The

*Ramsay* court held that "the developments in neuroscience, psychology, and sociology . . . have

sufficient rigor as to render them useful in determining how adolescence should impact

sentencing in general." *Id.*

In granting a sentence reduction, the *Ramsay* court relied upon the fact that, *inter alia*:

> . . . the prevailing neuroscientific explanation for adolescents'
> immaturity begins with the fact that [t]he frontal lobes, home to key
> components of the neural circuitry underlying executive functions
> such as planning, working memory, and impulse control, are among
> the last areas of the brain to mature; they may not be fully developed
> until halfway through the third decade of life. Children's brains have
> a proliferation of neural connections (dendritic overproduction).
> Then, beginning around age 11 to 12, rarely used connections are
> selectively pruned[,] making the brain more efficient. This increase in
> efficiency progresses from the back to the front of the brain; [e]vidence
> suggests that, in the prefrontal cortex, the area responsible for executive
> functions, the process is not complete until the early 20s or later.

> . . . When sentencing adolescent offenders . . . courts should bear in mind
> the adolescent maturity gap.

*Ramsay*, 538 F.Supp.3d at 417-418.

The *Ramsay* court further relied upon the Supreme Court's identification of another

"broad difference [between juveniles and adults] is that the character of a juvenile is not

as well formed as that of an adult. The personality traits of juveniles are more transitory, less

fixed. This 'struggle to define their identity' decreases the likelihood that even a heinous crime

committed by a juvenile is evidence of irretrievably depraved character." *Id.* at 422 (*citing* Roper,

*supra*, 543 U.S. at 570. The *Ramsy* court additionally found that "[r]espected social science

studies support this conclusion." *Id.* at 422. For these reasons, the Ramsay court stated that, when

sentencing adolescent offenders, judges should consider the chance that their youthful "character

deficiencies will be reformed." *Id.*

To be clear, the court's analysis in *Ramsay* is *not* an aberration; it is illustrative of the

trend by federal courts across the country to take into account the accepted science that youthful

offenders have markedly different brain development, and thus are found to be less culpable for

purposes of determining the duration of a defendant's sentence. *See, e.g., United States v.

Rosario*, No. 99-CR-533, 2018 WL 3785095, at *1-2 (E.D.N.Y., Aug. 9, 2018) (reducing

defendant's sentence based upon the Supreme Court cases cited in *Ramsay*, which

"[C]ollectively . . . **stand for the proposition that adolescents are different from adults—and

must be treated differently by courts . . . based not only on society's evolving standard of

decency,' but also on our increasing understanding of adolescent brain development**")

(emphasis added);[6] *United States v. Lebaron*, No. H-92-177-05, 2023 WL 7308116 (S.D. Texas,

---

[6] The court in *Rosario* further explained:

> . . . recent research has established that the areas of the human brain dealing with
> judgment and decision-making continue to mature well into our 20s. Thus, due to
> neurobiological immaturity, even older adolescents continue to demonstrate difficulties in
> exercising self-restraint, controlling impulses, considering future consequences, and
> making decisions independently from their peers' . . . These findings, taken together, are
> of significance in assessing all four of the classic penological justifications of
> punishment. As *Miller* states, retribution, deterrence, incapacitation, and rehabilitation
> typically will not justify the harshest sentences for juveniles who commit crimes, even for
> those who commit truly heinous crimes. In the words of the *Miller* court, quoting
> *Graham*: because [t]he heart of the retribution rationale relates to an offender's
> blameworthiness, the case for retribution is not as strong with a minor as with an adult.
> Nor can deterrence do the work in this context, because the same characteristics that
> render juveniles less culpable than adults—their immaturity, recklessness, and
> impetuosity—make them less likely to consider potential punishment. Similarly,
> [d]eciding that a juvenile offender forever will be a danger to society would require
> mak[ing] a judgment that [he] is incorrigible—but incorrigibility is inconsistent with

Sept. 6, 2023) (in ordering a reduced sentence, the court relied upon the United States Supreme

Court's recognition that "youthful offenders are less deserving of harsh punishment because, in

comparison to adults, juveniles have a lack of maturity and an underdeveloped sense of

responsibility, and "**the advances in scientific research on the development of the adolescent**

**brain"**) (citations omitted and emphasis added); *United States v. Faulkner*, No. 01-457-7, 2023

WL 1971192 at *4 (E.D. Pa., Feb. 13, 2023) (recognizing and relying on the "compelling

scientific research regarding adolescent brain development which indicates that **the area of the**

**brain that governs reasoning and impulse control continues to mature into a person's earl**

**to mid-twenties,**" in granting defendant a reduction in his sentence) (emphasis added); *Harmon*

*v. Secretary, Florida Dept. Corrs.*, No. 3:19-cv-1080-MMH-LLL, 2022 WL 4305920, at *11

(M.D. Fla., Sept. 19, 2022) ("**this Court is aware of the science and has fully and**

**thoughtfully considered the science on adolescent brain development in deciding an**

**appropriate and constitutional sentence** . . . Adolescent brain science sheds light on some of

the underlying causes of poor judgment and impulsive decision making in youth"); *United States*

*v. Golding*, 05-cr-538, 2022 WL 2985014 at *3 (S.D.N.Y. July 27, 2022) (citing and recognizing

the *Ramsay* court's "**recent scholarship relating to adolescent brain development**"); *United*

*States v. Cruz*, No. 3:94-CR-112, 2021 WL 1326851 at *7 (D. Conn., April 9, 2021) (granting a

reduction in sentence by relying upon the brain differences supported by the "**scientific**

**evidence**" regarding brain development between defendants who are younger than 21 years of

age and adult defendants); *United States v. Mazzini*, 487 F.Supp.3d 1170 at 1180 (D. New Mex.)

---

youth. And, finally, rehabilitation . . . reflects an irrevocable judgment about [an
offender's] value and place in society, at odds with a child's capacity for change.

*See Rosario,* 2018 WL 3785095, at *1 (internal quotations and citations omitted).

(court reduced sentence where the defendant was 21 years old at time of the offense and 25 years old at the time of sentencing based upon the "[S]cientific research" which has **revealed the profound ways in which adolescent brain development can compromise decision-making and contribute to criminal behavior**") (*citing Graham v. Florida*, 560 U.S. 48, 68-69 (2010)); *United States v. Cheng*, _ F. Supp. 3d _, No. 90-CR-1019-11 (E.D.N.Y. 2023) (reducing sentences to time served for three murders committed when the defendant was 21 and 22 years based upon these same concepts); *United States v. Sims*, No. 3:98-cr-45, 2021 WL 1603959 (E.D. Va. April 23, 2021) (reducing mandatory life sentence to time served for a defendant who was 21 at the time he participated in a bank robbery that resulted in a death, based upon the application of these concepts); *United States v. Espino*, No. 03-20051-08-JWL, 2022 WL 4465096 at *5 (D. Kan., Sept. 26, 2022) (applying same concepts and reducing sentence for defendant who was 20 years of age when he committed a murder as part of a drug-trafficking conspiracy); *United States v. Birkett*, No. 90-CR-1063-24, 2023 WL 4274683, at *8 (E.D.N.Y. June 29, 2023) (reducing sentences for offenses involving two murders for a defendant who was 18 at the time of the killings);

Moreover, the Seventh Circuit has already acknowledged the relevancy of the concept of adolescent brain development, albeit in a context outside of the sentencing of a defendant. Indeed, in *Horsley v. Trame*, 808 F.3d 1126 (7th Cir. 2015), the Seventh Circuit reviewed the District Court's grant of summary judgment against an eighteen-year-old applicant for a FOID card. The plaintiff challenged the State of Illinois' requirement that an applicant less than 21 years old needed to obtain the written consent of his parents. In upholding the district court's summary judgment ruling, the Seventh Circuit in *Thame* relied upon "scholarly research on development through early adulthood," including evidence that "**the brain does not cease to**

**mature until the early 20s in those relevant parts that govern impulsivity, judgment, planning for the future, foresight of consequences, and other characteristics that make people morally culpable.**" *Id.* at 1133 (emphasis added).[7]

Based upon the above-referenced body of case law, there is a substantial and nationally recognized basis for this Court to take into account the adolescent brain development of Ms. Mack – i.e., the scientifically well-founded lack thereof – at the time of the offense. To ignore that strongly developed case law, which is premised upon scientific research, would be contrary to section 3553, and quite frankly contrary to reality.

### *The Conditions At The Kerobokan Prison In Indonesia, Which Ms. Mack Was Forced To Endure During Her 7 Years Of Incarceration Strongly Militate Against An Additional Substantial Sentence In The Present Case*

The international community has long recognized the extraordinary inhumane conditions of prisons in Indonesia, including Kerobokan Prison. For example, one Human Rights Watch Report found that they violate: 1) essentially all of the minimum rules and standards that apply to prison cells, including with respect to sleeping accommodations, bedding, cleanliness, climatic conditions, cubic content of air, minimum floor space, lighting, heating, and ventilation; and 2) essentially of the conditions where prisoners are required to live and work, including with respect to windows, natural light. and fresh air and air quality. *See* Human Rights Watch (Asia Watch Committee), *Prison Conditions in Indonesia*, (1990).[8] Indeed, as noted above, the

---

[7] Citing, among others:
http://www.americanbar.org/content/dam/aba/publishing/criminal_justice_secti
on_newsletter/crimjust_juvjus_Gur_affidavit.authcheckdam.pdf; *see also, e.g.*,
Adam Ortiz, *Adolescence, Brain Development, and Legal Culpability*, American Bar
Association, Juvenile Justice Center (2004) (collecting studies). *Id.*

[8] *See* https://www.hrw.org/reports/pdfs/i/indonesa/indonesi908.pdf.

materials readily, publicly available on-line and everywhere speak openly of what a notoriously horrendous place Kerobokan Prison is to do time.

Ms. Mack's conditions of confinement and experiences at the Kerobokan Prison in Indonesia were unfortunately entirely consistent with all of those bleak assessments. During the first two years of her stay (after Ms. Mack gave birth to her daughter Stella), Ms. Mack shared a small cell with two other inmates – in addition to her newborn baby. The cell was left open to the outside elements because the "windows" had no glass, only bars. As a result, Ms. Mack's cell was constantly unbearably hot and humid. Moreover, when it rained, as was often, rain poured through the open windows and made moisture and standing water a constant problem. The cell was entirely devoid of even basic plumbing. The "bathroom" consisted of merely a sectioned-off part of the cell with a hole in the ground that served as the "toilet" – along with a bucket of dirty standing water. No soap of any kind was provided; it had to be purchased.

After Ms. Mack's daughter turned two years of age, Ms. Mack was moved out of her small cell into the general female population. The conditions were markedly worse. Although Ms. Mack's cell in general population was slightly larger, she was housed with twenty to twenty-five other inmates. Ms. Mack and her fellow cellmates slept on mats (not beds) - which were laid side-by-side given the overcrowding. Some of the cellmates were forced to sleep in the doorway area because of the overcrowding. But overcrowding was perhaps the least of Ms. Mack's and her fellow detainees' concerns. The Kerobokan Prison was infested with cockroaches, snakes, and rats. The rats would burrow under the pillows of Ms. Mack and the other inmates during the night.

The Kerobokan Prison did not provide Ms. Mack and her fellow detainees with even the most basic items, i.e., clothing, sanitary napkins, soap, etc. All such items had to be purchased or

otherwise obtained. However, even when Ms. Mack could obtain such items, they were regularly stolen. Ms. Mack and the other detainees only had small boxes, without locks, in which to store their belongings.

With respect to "nutrition," the Kerobokan Prison routinely fed Ms. Mack and her fellow detained a substance that consisted of brown rice with pebbles.

Furthermore, the complete lack of even basic plumbing impacted all other facets of daily life at the Kerobokan Prison. Like her former cell, in her new cell in general population, the inmates were provided a bucket containing dirty standing water with which to bathe. Oftentimes, the water inside the facility would not work at all, and Ms. Mack and the other detainees were expected to use an outdoor hose to bathe. Nor was there any Prison based means that laundered the detainees' clothes.

In sum, the conditions at the Kerobokan Prison were ridiculously harsh and inhumane. Accordingly, the Government's position that Ms. Mack should *not* be credited with a reduction to her sentence in the present case based upon the 7 years that Ms. Mack served at that facility is absurd. Moreover, the notion seemingly being floated by the Government and law enforcement in this case to the effect that Ms. Mack "had it easy" at the Kerobokan Prison; or that the conditions were somehow luxurious; or that Ms. Mack has special accommodations while detained within the Kerobokan Prison are all similarly baseless.

Clearly, a just and equitable sentence in the present case should take into account not only the 7 years that Ms. Mack was detained in Kerobokan Prison – but also the extraordinary and inhumane conditions with which she was forced to serve that time. Even if Ms. Mack somehow "deserved" those conditions because of her conduct, it would be entirely unjust - and contrary to

all of the legitimate aims of sentencing - to fail to fully account for those 7 years and those conditions.

### *This Court Should Strongly Consider Ms. Mack's Good Conduct During Her 7 Years Of Incarceration At The Kerobokan Prison, And During Her Two Years At The Chicago MCC*

In virtually any criminal case, whether in this District or anywhere else in the country, a defendant's conduct while detained is always considered keenly relevant. Defendants who engage in a pattern, or even incidents of, materially "bad conduct" or misconduct while detained and prior to sentencing are often "punished" in the sense that courts take such conduct into account when fashioning their sentences. Conversely, defendants who demonstrate consistently "good conduct" and/or who do not violate the guidelines and rules are often rewarded by Judges who take that factor into account at the time of sentencing. These are all common sense concepts.

In the present case, Ms. Mack's consistently good conduct, while incarcerated at the Kerobokan Prison, and while detained at the MCC Chicago during the pendency of the present case, should be strongly considered by this Court in determining Ms. Mack's sentence. Indeed, if Ms. Mack had *not* engaged in that good conduct while incarcerated at the Kerobokan Prison, and/or broken the guidelines and rules during that time period, there is no doubt that the Government in the present case would argue that such behavior merited this Court's attention for purposes of sentencing. Thus, to argue that Ms. Mack's consistent course of good conduct while incarcerated at the Kerobokan Prison - and which resulted in her being released three years early - is somehow *not* relevant to the determination of her sentence defies logic.

In any event, here Ms. Mack learned, early on, the potential life-threatening risks if she did not acculturate and follow the rules while incarcerated in Indonesia. One incident is particularly illustrative. After Ms. Mack was first arrested in Bali, she was taken to a local police

station, where she subsequently spent four months in custody. One day during the first few weeks of her stay, she observed a man escape from custody after the officer on duty became distracted. Ms. Mack alerted the officer, and the man was subsequently apprehended shortly thereafter. When police returned the man to the station, they shot him in the knee. The officer who shot the man then told Ms. Mack that the same would happen to her if she were not compliant.

Ms. Mack also received no sympathy or special treatment from Indonesian law enforcement or Kerobokan Prison prison staff based on her status as an American. In fact, her initial use of English and her engrained displays of American customs were viewed as non-compliant. This was largely based upon the hostility fueled by a pervasive anti-American sentiment. For example, even Ms. Mack's early simple requests to use the bathroom, uttered in English by her, were ignored. It was only after she began to learn how to make simple requests in the local language that she was even acknowledged. Ms. Mack's need to conform did not stop there.

Ms. Mack was also compelled to adopt the prevailing religious customs in Indonesia. She was expected to routinely cover her head like other Muslim female inmates. She was also expected to participate in religious ceremonies and traditions such as prayers and fasting. Thus, some of the behaviors that the Government cites as examples of Ms. Mack's purportedly "comfortable" and "privileged" experience while incarcerated in Indonesia are actually representative of how much effort Ms. Mack made to conform and comply. Freedom of religion was not a right she enjoyed. The Government apparently mistakenly views Ms. Mack's active participation, which was motivated by a desire to conform, follow the rules, and avoid reprisals, as privileged or voluntary conduct. That was far from the case.

Ms. Mack was also expected to conform to gender role dynamic behavior. For example, female inmates at the Kerobokan Prison had less access and freedom of movement than their male counterparts. Male inmates were also allowed to freely access the female cells, with almost no deterrence from prison staff – at least up until the above-referenced separation "wall" was established at that facility. There was no such thing as a grievance procedure to address such routine occurrence of sexual and gender-based harassment.

Furthermore, Kerobokan Prison officials, including the Warden, pressured Ms. Mack to represent the facility in a positive light. Ms. Mack recalls giving an interview during which she made several objectively positive statements about her experience and time in the Kerobokan Prison. *See also* PSR, at ¶44. However, those statements, like the rest of Ms. Mack's behavior while incarcerated in Indonesia, were far from voluntary; instead, they were a necessary display of compliance and conformity to the Kerobokan Prison's expectations and Indonesian cultural norms to ensure her survival.

Ultimately, the degree to which Ms. Mack was successful in conforming to Kerobokan Prison expectations and Indonesian cultural norms—in short, behaving well—certainly contributed to the 3 years of good time credit that she received. Although her Indonesian prison experience offered unique incentives to Ms. Mack to comply, her good-natured conduct is entirely consistent with the time that she has served at the MCC.

While at the MCC, Ms. Mack's conduct has been exemplary. She has taken advantage of any relevant programs available to her. Moreover, one would be hard-pressed to find anyone, detainee or MCC personnel, who has a bad word to say about Ms. Mack. She has been mature, entirely cooperative, respectful, and someone whom people want to be around.

***Ms. Mack Did NOT Enjoy A "Celebrity Status" While Incarcerated In Indonesia***

As noted above, the Government attempts to argue that Ms. Mack's 7 years of incarceration in Indonesia, as well as her good conduct during that 7-year time period, is somehow irrelevant to this Court's sentencing determination – and should not be factored in as a reduction to the sentence imposed by the Court in the present case. Yet, the Government goes out of its way to attempt to paint Ms. Mack in a negative light by suggesting that she really "had it good" while incarcerated in Indonesia – i.e., so "good" that she had, and was afforded, "celebrity status" during that time period. This is a gross misrepresentation of reality.

Here, it is certainly undisputed that heightened attention was directed at Ms. Mack and her case from the very start. However, this did not, as the Government contends, result in a "celebrity" status that allowed Ms. Mack to avoid the undeniably harsh conditions suffered by her and the other inmates at the Kerobokan Prison. The PSR notes several unsubstantiated, speculative suggestions that Ms. Mack exploited her financial circumstances to "buy" special favor at the prison. *Id.* The reality is that there is absolutely no evidence to support those claims.

For example, as noted in the PSR, Mr. Wiese (Ms. Mack's maternal Uncle) and Ms. Hellman both reported that Ms. Mack was "officially or unofficially granted weekend furloughs outside the facility and had her own cellphone." *Id.* What these individuals failed to note is that Ms. Mack was only ever allowed to leave the Kerobokan Prison for medical and dental appointments (when she had the money to pay for care outside the prison), and at all such times was in the company of law enforcement. Once her daughter Stella left the facility, Ms. Mack's only routine contacts with Stella came about during her once-weekly visits. Ms. Mack was in fact occasionally allowed to leave the facility to accompany her daughter to scheduled medical or

dental appointments. But again, only under circumstances where there was the presence of law enforcement, and Ms. Mack was always immediately returned to the facility the very same day.

On a few occasions, Ms. Mack was also able to schedule her own medical or dental appointments to align with her daughter's birthday. The members of law enforcement escorting her to these appointments would sometimes allow Ms. Mack to meet her daughter for a brief lunch before returning Ms. Mack to the Kerobokan Prison. Those occurrences were always in conjunction with medical or dental appointments, and of course always occurred with the presence of law enforcement. These were definitely **not** "furloughs." They were nothing more than a loving and desperate mother attempting to get some additional time with the daughter that she sorely missed and ached to spend time with. That this is somehow a "negative" or point against Ms. Mack is quite frankly ridiculous.

Similarly, the PSR makes note of the fact that, at some points during her incarceration in Indonesia, Ms. Mack had possession and use of a cell phone. This is again offered as further evidence of Ms. Mack's alleged "celebrity status" and the purported preferential treatment she was allegedly afforded. This assertion is baseless and uninformed. Cell phones were considered contraband at the Kerobokan Prison and possession or use of them was punishable by a period of solitary confinement. Inmates, including Ms. Mack, took a calculated risk in periodically using cell phones. More significantly, unlike virtually any other prison anywhere, the Kerobokan Prison did not provide landline phones for the inmates to make or receive calls. Accordingly, cell phone usage for most inmates was the only means of contact with those outside the Kerobokan Prison.

Even more to the point with respect to Ms. Mack, after her daughter Stella's visitation privileges at the Kerobokan Prison were eliminated as a result of Covid restrictions, Ms. Mack's

use of a cell phone was her only means of maintaining regular contact with Stella during that time period. What kind of mother, or father, would *not* employ or attempt to employ a cell phone to maintain contact with their child under such circumstances? Every single one – regardless of the potential consequences.

Moreover, Ms. Mack was also caught using a cell phone, and as a result, given the same solitary confinement punishment that all other inmates suffered. It is safe to say that any legitimate mother, or father, would risk and accept such punishments as the price to pay in exchange for communicating with the one person in the world they loved most. Furthermore, like all of the other inmates, Ms. Mack's cell phone was often stolen by her follow inmates and even by prison staff. As a result, Ms. Mack often went long periods of time without a cell phone – and of course with less contact with her daughter during such time periods.

In sum, although Ms. Mack certainly received more attention than her fellow inmates as a result of her case, she did not receive special treatment. More importantly, she experienced and suffered the same indescribable hardships as the other inmates at the Kerobokan Prison. Ms. Mack's time at that prison cannot simply be measured in years, nor should this Court weigh that time in such a limited fashion. During her incarceration in Indonesia, Ms. Mack was just emerging from adolescence herself; she had given birth to her only daughter; she was still suffering from untreated emotional and psychological trauma; she weathered a pandemic while incarcerated; and as a foreign, young female, she was completely at the mercy of the Bali prison staff.

***Ms. Mack's Extraordinary Family Circumstances Support The Imposition Of A Sentence Of 15 Years, Minus The Time That She Already Served In The Kerobokan Prison***

"Extraordinary family circumstances may constitute a legitimate basis for imposing a below-guidelines sentence, under either guidelines provision 5H1.6 or under section 3553(a). *United States v. Smith*, 860 F.3d 508, 518 (7th Cir. 2017) (*citing United States v. Schroeder*, 536 F.3d 746, 755-756 (7th Cir. 2008)). Accordingly, this Court may appropriately take into account Ms. Mack's "family circumstances" in fashioning her sentence. *See United States v. Graham*, 915 F.3d 455, 459 (7th Cir. 2019) ("a defendant's family circumstances may be a legitimate basis for a below-guidelines sentence if the district court finds 'that a defendant's family ties and responsibilities . . . are so unusual that they may be characterized as extraordinary.'") (*quoting United States v. Schroeder*, 536 F.3d 746, 755-756 (7th Cir. 2008). The rationale for a "downward departure" based upon family circumstances "is not that family circumstances decrease [a defendant's] culpability, but that we are reluctant to wreak extraordinary destruction on dependents who rely solely on the defendant for their upbringing." *United States v. Johnson*, 964 F.2d 124, 129 (2nd Cir. 1992) (brackets added) (affirming district court's 13-level "downward departure" based upon the extraordinary family circumstances presented, i.e., defendant's role as a mother). As set forth below, such extraordinary family circumstances exist in this case, and thus this Court should consider them in fashioning Ms. Mack's sentence.

Here, Ms. Mack has one child – her now eight-year-old daughter, "Stella." Because of Ms. Mack's detention at the MCC, Stella is currently in the care of Lisa Hellmann, Ms. Mack's maternal cousin, in Colorado.

Stella was born in March 2015 while Ms. Mack was in custody in Bali, Indonesia. By all accounts, Ms. Mack has been an outstanding, caring, devoted, and loving mother. Since Stella's

birth, Ms. Mack has made every conceivable effort to maintain a direct, active, and positive role in Stella's life.

Indeed, following her birth, Stella was allowed to live with Ms. Mack on a full-time basis *in* the Kerobokan Prison for the first two years of life. Thus, despite the generally horrendous conditions of the Kerobokan Prison, [9] Ms. Mack was able to live with and personally care for Stella. Those first two crucial years of Stella's life established the invaluable and everlasting foundational bond between mother and child. Ms. Mack spent every moment with her daughter, providing the best care that she could muster under the conditions – and despite her complete unpreparedness for mothering; her lack of parental role models; and the complete absence of family and friends to assist her with the somewhat overwhelming newness and responsibilities of being a brand-new mother.

After the first two years of Stella's life, the Kerobokan Prison regulations required that Stella no longer live within the prison. As a result, Stella was then placed with someone who was then a friend of Ms. Mack, Oshar Suratama - who lived nearby. During that time period, Ms. Suratama fully supported Ms. Mack in her sustained and continuing efforts to maintain a close relationship with Stella. Ms. Suratama ensured that Stella maintained regular contact with Ms. Mack, and regularly brought Stella to visit Ms. Mack in at the Kerobokan Prison - up until Covid restrictions made those in-person visits impermissible and impossible. However, during the pandemic, Ms. Mack was allowed to continue to maintain a close and loving relationship with Stella through regular telephone and video visits. Following the lifting of Covid restrictions,

---

[9] Again, as noted above, the conditions at Kerobokan Prison included, among other things, cockroaches, snakes, and rat infestations; exposure to the outside elements through windows that had bars, but no glass; and use of a "restroom" which consisted of a bucket with water and a hole in the ground.

Stella was again allowed to visit Ms. Mack in-person at the Kerobokan Prison. In sum, during the time period of Ms. Mack's incarceration within the Kerobokan Prison, Ms. Mack and Stella had a tremendous relationship – and Stella adored Ms. Mack and Ms. Mack adored Stella.

Upon her release from custody from the Kerobokan Prison, Ms. Mack made the conscious and intentional decision to return to the United States, with Stella, with the hopes of providing her with a better home environment, quality of life, and future. In so doing, Ms. Mack acted with the knowledge (after being tipped off by Bali officials) that she would face criminal charges in the United States upon her return. Ms. Mack nevertheless chose to return to the United because she prioritized the benefits to Stella of a life in the United States. Ms. Mack took steps necessary to prepare and execute temporary guardianship paperwork to ensure the continuity of care for Stella in the United States.

Ultimately, DCFS became involved and removed Stella from Ms. Mack's custody. As noted above, Stella presently resides in Colorado pursuant to a guardianship Order that placed her with Ms. Hellmann. Stella also continues to remain the subject of on-going legal proceedings in the Circuit Court of Cook County. Ms. Mack retains her parental rights with respect to Stella, and she is allowed to have weekly contact with Stella. However, Ms. Hellmann has been less supportive of protecting Ms. Mack's parental rights and access to Stella in light of the strained nature of Ms. Mack's relationship with her mother's side of the family. Consequently, Ms. Mack has recently only been able to speak with Stella, at best, once or twice per month – and, per Ms. Hellmann's interventions, Ms. Mack's calls have quite frequently gone unanswered or unreturned. Ms. Mack remains hopeful of maintaining the incredibly close relationship and bond that she has enjoyed with Stella, including if necessary by way of directives from the Circuit Court of Cook County to Ms. Hellmann. Ms. Mack also continues to attempt to work on and

better herself with the goal of strengthening her own capacity to continue to be a healthy, consistent, and positive force in her daughter's life.

The extraordinary nature of Ms. Mack's family circumstances is as relevant as it is undeniable. Those circumstances constitutes a legitimate basis for imposing a sentence that makes it possible for Ms. Mack and Stella to feasibly maintain their all-important mother/daughter relationship.

Indeed, the birth of a first child is both an exceptionally positive and an unexpectedly difficult event for any mother. For Ms. Mack to have experienced the birth of Stella while in prison was immeasurably more challenging – as was caring for Stella while in prison. Moreover, Ms. Mack fully appreciates that her incarceration in Indonesia resulted from her own conduct and choices. However, Ms. Mack's continued incarceration in a United States prison will result in the most harm to an innocent third-party, her daughter Stella. Stella's relationship with Ms. Mack has already been altered by her inability to have a fully normal relationship, for *seven years*, while Ms. Mack was imprisoned in Indonesia. That mother/daughter relationship has now been further strained and undermined by Ms. Mack's continued detention in the United States at the MCC for more than *two more* additional years. Theres is simply no legitimate reason for Stella to continue to be irreversibly damaged by an additional lengthy term of incarceration imposed upon Ms. Mack. Such a lengthy term of incarceration will have devastating and life-long consequences for Stella.

Finally, to be clear, Ms. Mack is not suggesting that *she* is less culpable for Ms. Von Weise's death because of the birth of Stella; however, the point is that Stella is certainly *not* culpable because of Ms. Mack's actions. Therefore, to the extent possible, and consistent with the aims of sentencing and the 3553 factors, this Court should fashion a sentence that helps

ensure that Ms. Mack and Stella are given the opportunity to forge the best mother/daughter relationship going forward. A limited sentence of incarceration for Ms. Mack will go a long way toward ensuring that Stella is not collaterally damaged. That is particularly the case where, as here, this Court could impose conditions such as house arrest or home detention upon Ms. Mack, which would still allow Ms. Mack and Stella to live and grow together in the closest and next best thing to a full mother/daughter relationship.

### *The Imposition Of A 15-Year Sentence, Less The Time That Ms. Mack Has Already Served In Indonesian Prison, Is Fully Consistent With, And Meaningfully Takes Into Account, Ms. Mack's Untreated Psychological Condition At The Time Of The Offense*

Based upon the protected health information contained within it, Ms. Mack's counsel has filed the expert report of Dr. Pesanti under seal. *See* Pesanti Report. However, in sum, Dr. Pesanti's Report firmly establishes that the traumas that Ms. Mack experienced as an adolescent; her diagnosed but essentially mental health conditions; coupled with her tumultuous relationship with Ms. Von Weise, provide yet another basis of mitigation in favor of Ms. Mack – under section 3553 and otherwise. For those additional reason, the imposition of a sentence of 15 years, minus the time that Ms. Mack has already served in Indonesia, would be clearly sufficient but "not greater than necessary" to achieve all of the legitimate aims of sentencing.

### *The Extraordinary Harsh Conditions Of Confinement At The MCC Should Also Be Taken Into Account In Imposing A Sentence On Ms. Mack*

Here, Ms. Mack and many of her fellow detainees at the MCC were forced to endure near lockdown conditions for virtually the entire pandemic. These conditions were attuned to solitary type confinement, and took an extraordinary toll on Ms. Mack's emotional and psychological condition. Like her fellow MCC detainees, Ms. Mack was housed - for a significant period of time - in a manner that offered essentially no legitimate programming; extremely limited movement; reduced, and extremely limited contact with the outside world. In fact, during that

extended COVIP period, Ms. Mack and her fellow MCC detainees never set foot outside. On top of all that, Ms. Mack had to constantly worry about Covid-19 outbreaks and deaths, and the associated fear of contracting it, if not losing her life to it. In sum, those conditions - for that extended period of time - were truly "extraordinarily harsh."

Since that time, Ms. Mack and her fellow detainees at the MCC have had to grapple with deaths at the MCC arising out of the fentanyl crisis.

Based upon all of the foregoing, this Court should hold that, pursuant to the 3553 factors, these conditions of confinement were "extraordinarily harsh," and thus represent merit and necessitate consideration for purposes of Ms. Mack. This Court's peers within the Northern District have regularly relied upon the conditions at the MCC during COVID as a basis for a sentence reduction, and/or as mitigation. In other words, Judges in this building have already recognized that the conditions of confinement during the pandemic have been extraordinarily harsh because of the pandemic and the detention procedures employed as a direct result – and thus merit consideration under section 3553 and a sentence reduction. *See, e.g.*, as just some examples: *United States v. Dickey*, 16 CR 475 (Judge Ellis) (the Court stated, as part of the sentencing hearing, that it would have given the defendant a substantially greater sentence [in particular, three additional years[, but did not do so in light of these very extraordinarily harsh conditions of confinement during the pandemic; *see also United States v. Miller*, Case No. 20 CR 763 (Judge Lee) recognized that same argument in sentencing the defendant in that case.

### *This Court Should Also Consider Ms. Mack's Limited Criminal History*

A defendant's Criminal History category is strongly correlated with recidivism. The USSC data demonstrates that offenders with zero criminal history points have the lowest re-arrest rates, i.e., slightly more than one-quarter (26.8%) of offenders with no criminal history

points are re-arrested. Although, ss indicated in the PSR, Ms. Mack has *one* criminal history

point, she narrowly misses falling within the lowest criminal history category. *See* PSR, at ¶45.

Accordingly, Ms. Mack presents with a statistically low likelihood of recidivism. In fact, Ms.

Mack's only brushes with the law, apart from the present case, arose during her high school teen

years and generally for relatively non-serious conduct.

### The Wholly Unnecessary Cost Of Confinement Should Also Be Considered By This Court In Imposing Its Sentence

It would clearly be a waste of public resources to pay hundreds of thousands to millions

of dollars to continue to incarcerate Ms. Mack for additional years beyond the minimum

sentence available to this Court to impose. This is particularly where, as here, the community

does *not* need to be protected from her – and any perceived need for such protection can be fully

and adequately addressed and achieved by way of the terms of Supervised Release. Moreover,

and more importantly, Ms. Mack has already demonstrated to this Court, by way of her service

of her sentence in Indonesia, her service of her sentence at the MCC, and her good conduct while

incarcerated in Indonesia and while detained at the MCC, that she is ready, now, to return to the

community and to be gainfully employed in such a manner that he can benefit the community,

her daughter, and herself.  Again, for the taxpayers to incur the hundreds of thousands to millions

of dollars to incarcerate Ms. Mack for an extended period of time within the BOP is particularly

unnecessary where, as here, this Court could impose conditions such as house arrest or home

detention upon Ms. Mack – at virtually no cost to the citizenry, or at costs which could be

assessed against and borne by Ms. Mack.

## IV.    DEFENDANT'S POSITION REGARDING SUPERVISED RELEASE

*__Ms. Mack's Limited Objections To The Proposed Terms Of Supervised Release__*

Discretionary Condition No. 6 (PSR, at p. 33): Ms. Mack objects, in part. In light of the fact that Mr. Schaefer is the father of Ms. Mack's child, it seems unnecessary and unrealistic that she never have contact with him. Likewise, although she has no plans to have contact with Bibbs, there does not seem to be any compelling reason to bar her from ever communicating with him.

Discretionary Condition No. 9 (PSR, at p. 33): Ms. Mack objects, in part. Based upon Ms. Mack's history, there does not appear to be a reason for her to be in a substance abuse program after the service of any term of incarceration.

Discretionary Condition No. 16 (PSR, at p. 34): There is no legitimate reason for US Probation to visit Ms. Mack at her place of employment. Employment can be verified in many ways, and such visits only serve to jeopardize the employment of former offenders.

Special Condition No. 13 (PSR, at p. 37): Ms. Mack objects to this condition. Ms. Mack's counsel objects to the ability, capability, expertise, and competence of US Probation to make any such "risk" determinations in the first instance, and to a requirement that such "risk" determination then be communicated to third parties.

**WHEREFORE**, Ms. Mack, by and through her undersigned counsel, respectfully requests that this Court sentence her to a sentence of 8 additional years, and for such other and further relief as is appropriate.

Respectfully submitted,

                    By:    **/s/MICHAEL I. LEONARD**
                           **One of the Attorney for Heather Mack**


**LEONARD TRIAL LAWYERS**
Michael I. Leonard
Matthew A. Chivari
120 North LaSalle, Suite 2000
Chicago, Illinois 60602
(312)380-6559 (phone)
(312)264-9671 (fax)
mleonard@leonardtriallawyers.com

**JEFFRY N. STEINBACK, LLC**
Jeffrey Bruce Steinback
8351 Snaresbrook Rd
Roscoe, IL 61073
(847)624-9600 (phone)
jbsteinbacklaw@aol.com

## CERTIFICATE OF SERVICE

The undersigned states that, on January 8, 2024, he EFILED by way of this Court's ECF filing system, the above Defendant's Sentencing Memorandum and therefore served it upon all counsel of record.

By:**/s/ Michael I. Leonard**
   **Counsel for Ms. Mack**

**LEONARD TRIAL LAWYERS**
Michael I. Leonard
120 North LaSalle, Suite 2000
Chicago, Illinois 60602
(312)380-6559 (phone)
(312)264-9671 (fax)
mleonard@leonardtriallawyers.com